Whenever you're ready. Mr. Preece. Is it pronounced Preece? Pryce. Pryce. How are you all this afternoon? Good. I've never had it pronounced right. I'm sorry. That's all right. I mispronounced my name. That's all right. Pry-ween. The Louisiana pronunciation. May it please the court, my name is Philip Pryce. I represent the Louisiana funds, which are three Louisiana pension plans. And as the court is aware, based upon the briefing, the issue before the court is the fact that a summary judgment was rendered on the factual question of whether the Citco Group and its related companies are controlled persons. And we filed the appeal saying that questions of fact exist. And so in the opening, I think it's very important for the court to understand four essentially uncontested facts for purposes of the summary judgment. Obviously, they may be contested at trial. First of all, that the Citco defendants did not contest that they received a $50 million benefit from the offering. Now, they may ultimately contest it, but for purposes of the summary judgment, that is uncontested. Now, the reason why that's important, as the court is aware, based upon the Heck case, one of the issues that establishes controlled person liability is the ability to control the violation. In this particular case, we argue that it's undisclosed. The $50 million benefit that they received is undisclosed. It's not like it went to some third party that they didn't know about. The $50 million benefit is undisclosed. Maybe just list the four. You had four. If you list them at the beginning, because we may want to carve into each one. So one is the $50 million benefit. Second undisputed fact? The second one is the Millennium ownership of all the voting shares of Leverage. And that essentially comes up as the documents and the district court determine that Millennium held the voting shares of the company. And there's no written agreement that would indicate that it was held for administrative purposes. So that's the second issue. And then the third issue, which is really based upon the written documents, is the control rights in the articles essentially are the voting rights in the articles clearly establish control. And why do I say that? The articles state that the voting shareholders can hold a meeting without notice based on a written consent and whatever motion they adopt becomes effective immediately. In the corporate world, that provision in and of itself indicates substantial ability to control the direction of the company. And so this determination was based upon Professor Spindler, who is a University of Texas securities professor. And he was the one that had rendered the opinion and the analysis that they clearly had the right without notice to adopt a written consent. I'm just going to – because your time is ticking away. If we reach this issue, am I right that certainly two and three determine whether ability to control is sufficient? That's right. And as you know, I was on the HEC panel. But would you agree then that those three points aren't factual disputes as to actual control? So it really – does it all come down to that legal question? Well, I agree the legal question is exactly what you just said, is the ability to control. In other words, if you have control and don't exercise it. And that seems to be the issue in this case. So passive ownership control, full stock ownership, is sufficient. Now, obviously, you've acknowledged in the brief that a court like the First Circuit, and they count the Seventh Circuit, would disagree with that. And in HECT, I thought we sort of dodged deciding that in – you'll know the footnote number, whatever footnote it was. Right. But the question that you pose is the central issue in the case, the ability to control. In other words, whether unexercised control would give rise to controlled personal liability. And so in a hypothetical, let's assume you – It's a little incongruous to say that a passive owner, share owner, is somehow directing and controlling activities that may be wrongful. They may just have passive ownership. How is that control as contemplated by the Louisiana statute? Because you have the ability to exercise that control. Now, let's say that you had no relationship to the transaction. Yeah. I read our law saying you don't have to be a participant. Other circuits would say copal participation is necessary. And then at the other end, auditors aren't going to be exposed. And so there's this nebulous middle. And the district court was of the viewpoint there has to be indicio. It can't just be a relationship, a passive relationship. It has to be connected to these transactions. And I guess I'll ask you, if that happens to be the law, do you have evidence of that? Well, they signed the consent to issue the preferred shares. In other words, it had to be approved by – Isn't that more like the auditor? Wouldn't that be more – No, I view it as an affirmative act to being involved in the violation. And so the question that you're asking, Judge Higginson, is on the $50 million violation, just assume that they got $50 million. And for purposes of what we're talking about today, that's the way it comes up on a competent summary judgment because it didn't contest it. Did they solicit investors for leverage? No. No. But so the question that comes up is whether they had a duty to disclose the benefit that they were receiving from the offering given the fact that they own all of the voting shares of the stock and that the articles are a little bit more than the passive ownership because of the fact that by written consent, without even calling a meeting, they could replace directors, increase the board, and could have exercised that right. So assuming that they knew that they were getting $50 million and it was not disclosed in the offering memorandum, then the question becomes did they have the ability to make sure that it complied with the securities law? And the answer to that is a resounding yes. There's no doubt that if they had known it was not in compliance with the securities law, i.e. a disclosure was not made on the $50 million. But wouldn't an auditor have the ability to blow a whistle? But the whistleblower is a little bit different situation or it's the but-for analysis that they use. What's your best circuit authority other than HECT? Because in HECT we really didn't conclusively resolve that question. What's your best, either Louisiana case or circuit case? Well, HECT really establishes. I'm asking you is there any other circuit that would expand control to a person looking at federal law the way you're urging? Or is HECT, are we the outlier? No, I think the better way to say it is what's the law in the other circuits? And in the other circuits, particularly the Second Circuit, you have the culpable participation test, which requires an affirmative act. And in our situation under the G.A. Thomas case, I mean it specifically says control person liability does not require participation in a fraudulent transaction. So the law in this circuit, starting with Enron, has always been based upon the rationale. And this is in TIG Specialty v. Pinkney. The rationale behind control person liability is that a control person is in a position to prevent the securities violation. It doesn't require that he actually act. At this stage of the proceedings, is there anything in the record that the CITCO defendants having actually exercised control over leveraged? Ability to do it is one thing. Has there been, is there anything in the record to date that reflects that? To approve, okay. The transaction, the non-voting shares that existed prior to the time the Louisiana funds invested, okay, those were represented by CITCO. And CITCO had solicited those funds through Rich Court, okay. Now, the record as we show it shows the investment not performing. So what did CITCO do to go out and on an affirmative step, as I think the question that you're asking me, what affirmative step did they undertake to control the violation? To be leveraged. Yeah, okay. The first thing they did is the person that worked for CFS Cayman, the administrator, signed the amendment with the Cayman authorities to authorize the issuance of the preferred shares. And that's in the record. The second thing they did is that the articles provide that before preferred shares can be issued, that it has to be approved by the existing shareholders. And in the record, or in the brief, we show that Mr. Untermyer, on behalf of Rich Court and CITCO, and Mr. Untermyer was on the board of directors of CITCO Group, actually approved the issuance of the shares on behalf of the non-Series N shareholders or the existing shareholders. So it's our argument that essentially they bailed out a bad situation through the affirmative acts of approving that. Now, that is an affirmative act. The other affirmative act is that they were responsible in the offering memorandum for the valuation of the assets. And as we point out, there's a memorandum that shows that they knew that the assets were undervalued by about $130 million. And yet they didn't do anything in the offering memorandum to state that they knew that the assets were misvalued. You're about to run out of time. I wanted to give you a chance to deal with appellate jurisdiction. I'm sorry. I wanted to give you a chance to deal with appellate jurisdiction. The appellate jurisdiction. Right. Don't we have a final judgment problem here? Right, right, right. The appellate jurisdiction argument comes up in the context of the dismissals of two individuals, okay? And essentially what happened there is that the court ruled against Sitko, and then we were faced with a trial date within 10 days, and we were under a lot of pressure to either go to trial on the remaining defendants or to dismiss the two. And so we dismissed without prejudice that the lady that had originally been filed a lawsuit, but the record shows that she was never served, okay? And then we dismissed, we entered into a settlement with Mr. Kiley. All of this took place in January. So don't we have a problem then? Well, the reason why we don't have a problem is that the existing law says that the dismissal has to be of the remaining claims. In other words, if you look at all the cases where this has been applied, and I think the dissent talks about it being unfair, what you have is a dismissal of remaining claims at the end of it. This wasn't anywhere near the end of the lawsuit. And the lawsuit is still pending right now, right? Well, no. No. I mean, the only thing that's remaining is in this lawsuit right now. In other words, a final judgment was signed, and no claims were at the district court. So if Ms. Alexander were to come again, it would be a new case? It would be a new case, but as a practical matter, it's 10 years and prescribed. And as I said, we never served her in the lawsuit. So we find we don't have jurisdiction. Does the district court have jurisdiction to enter the 54B that you just talked about? Well, this is where it gets complicated, Judge Egginton. We asked for a 54B, okay? But it wasn't for the reason that you're talking about here, Judge Hope. It was because we wanted to go ahead and appeal the Sitco. So if you look in the record, you'll see that we asked the judge for a 54B. Guess what? She wouldn't grant it. So if the law is, as suggested by Judge Hope, that the total case is dismissed, then we've got no ability to appeal. I mean, we have essentially been denied our appeals rights because a 54B motion was not granted by the district court, and we're not there. Now, I hope that the en banc decision of the Fifth Circuit recognizes the inequity of the situation. The reality is that the court system was in an emergency meltdown during the January when we were supposed to go to try this case. There was extreme pressure for us not to clog the docket, and we did what I think was our professional duty to get these cases dismissed, particularly when it wasn't going to be with solvent people. And we did that, and I think we did a good job of that. And I think on the second one, it would be a dismissal, and then if it wasn't settled within 60 days, you could come back under section request under 60B to have the judgment reinstated. But the judgment said if you don't come into this court and ask to be reinstated within 60 days, it's dismissed. Okay. You have rebuttal time. Thank you, Counsel. Thank you. Whenever you're ready. Thank you, Judge Higginson. Kenneth Shanmugam of Paul Weiss for the Sitko defendants. May it please the Court. As a threshold matter, plaintiffs have not yet obtained an appealable final judgment from the district court on their claims against the Sitko defendants, and the appeal should be dismissed on that ground so that the plaintiffs can go back to the district court and do so. And I'm happy to start with that issue and very briefly address it before I turn to the merits. Because they're saying that you can't go back. I'm sorry. They're saying they can't go back. I think that they could go back to the district court and obtain a Rule 54B determination. It is true, as Mr. Price says, that there are no live claims remaining in the district court at this point, but I think it would be appropriate under this court's Ryan line of cases for the district court to enter a Rule 54B determination, namely a determination that there is no just cause for delay for the appeal to go forward. The problem here is that plaintiffs were not able to obtain such a Rule 54B determination and did not seek such a determination even after the claims as the remaining defendants were resolved, which is to say that there was a judgment entered and then an amended judgment in, I think, February of last year, but there were still the proceedings on the default judgment against Mr. Fletcher. And then another judgment was entered, and that was really the point at which the district court should have entered a 54B determination under the reasoning of this court's Ryan line of cases. So we certainly think that the district court could go ahead and do that. Now, of course, this court currently has the en banc proceedings before it in the Williams case. I think the facts of the Williams case are somewhat different because at the relevant time in the Williams case there really were no other defendants remaining. And as you may be aware, in the Williams case, the judgment that the district court entered in the subsequent proceedings was kind of a weird judgment. It was a Rule 54B determination in which the district court attempted to convert a dismissal without prejudice into a dismissal with prejudice. And I think in the en banc proceedings the court will presumably be considering the question of whether or not a district court can do that. We do think that the district court could fix this, but that under the Ryan line of cases it needs to be fixed because you have the same concern about the prospect of piecemeal appeals that motivates the whole Ryan line of cases. In other words, you have the risk that with the voluntary dismissal that the plaintiff could bring those claims back to life and therefore essentially circumvent the requirements of Rule 54B. But two questions. There's no suggestion in this record they did it with an intent to manipulate. There's no such suggestion, but of course this court's Ryan test doesn't turn on intent, unlike the tests of other circuits. It's just a bright line rule that essentially says that when you have a voluntary dismissal in the wake of the ruling that you're seeking to challenge on appeal, you can't circumvent 54B by turning what would otherwise be a non-final ruling into a final judgment. That's the whole upshot of this court's line of cases. So in terms of going back to district court, are you saying that there are proceedings remaining in district court right now or that it's over but somehow the district court can reopen? Well, I don't think that there's really anything to reopen because I think that the upshot of the Ryan line of cases is that you don't have finality. In other words, that by virtue of the fact that you have this voluntary dismissal, there is still the prospect of those claims coming back to life. Those would be in a new case. They could potentially be a new case on the district court's docket. Now, if there's a question about whether the district court can do that, I would submit that the other thing that a district court could potentially do is use Rule 60A to essentially say this was essentially the equivalent of a mistake in the earlier judgment and I'm going to cure it by entering a Rule 54B. But we do think that that should be permitted, and a lot of the same considerations at play in the Williams case come into play here. I think that it is – Three quick questions. Yes. Because there are moving pieces. Yes. Twice asked for letter briefs on this, but Williams has interceded. You are not suggesting we ought to hold this jurisdictional? I don't think you need to because the facts of Williams are different because in this case – This case is controlled by Ryan. I think so because at the time that all of this took place, there were still other defendants in the case, and I think that what plaintiffs need here is just a simple no just cause for delay determination from the district court. And so I think that the Williams case is in a somewhat different posture. And I realize that the court could potentially revisit the Ryan line of cases in Williams, and I suppose that if the court, in fact, did that, it would be appropriate for this court to hold its decision in this case just to make sure that it's turning square corners on the jurisdictional issue. That doesn't look like a serious prospect in the Williams case, but I know that the parties are submitting their briefs for the en banc court starting next week, and so it may be prudent, particularly since the argument is next month, for the court just to wait, and, of course, the court will be aware of what's going on in the Williams case after that argument. So your position sensitive to this sort of our law here, was it the original position you took once they noticed for appeal or not? Well, once they originally noticed the appeal in our jurisdictional statement, we pointed out the fact that the initial judgment was plainly premature and that it was the subsequent judgment that could potentially qualify as the final judgment. Of course, this court then issued its panel opinion in Williams, not only reaffirming the Ryan rule but saying a fair amount about what would subsequently take place, and that is obviously what precipitated the court's request for supplemental briefing, and we have, I think, set out our position in both of those briefs to the effect that we think that this is something that could be cured if the court concludes that the subsequent judgment was, in fact, not a final judgment. Having been on the HEC panel, why shouldn't that decision make me reluctant to construe the Louisiana control person statute narrowly? I think there has been water under the bridge even since HEC in that there is now, I think, a pretty robust body of case law on the federal level for the proposition that actual control is required. We also, of course, rely on the Solow case, which was extant at the time of the panel's decision in HEC for the proposition that the Louisiana courts also appear to require actual control. I think that if actual control is, in fact, the standard under the Louisiana laws, we believe that it is, that this is a quite straightforward case, and I don't really hear Mr. Price in his argument to suggest otherwise. But one thing I do want to just emphasize and highlight is— It seems, in hindsight, a little incongruous for us to have said ability and then in a footnote to say, but it may also be actual. I think it was just the court realizing that it had a relatively easy case on the facts before it and prudently deciding not to resolve definitively the question of the legal standard in light of that. Because if it were ability to control, then full ownership of Millennium would seem to at least create an issue of fact. Well, I was just going to say, though, Judge Higginson, that I think that even if you think that an ability to control is sufficient, that we should still prevail on this record. I want to go to what I think is really the core of the three theories in Plaintiff's Brief that Mr. Price exclusively focuses on today, which is this theory of control through ownership. Now, at the outset, I think it bears emphasizing that this is a quite unusual and attenuated theory of control because the theory at issue is a theory that Sitko Group itself owned Millennium, which itself held the voting shares and leveraged, and therefore that Sitko Group effectively exercised control through that two-step theory of ownership. Now, Mr. Price in his argument focused exclusively on the relationship between Millennium and leveraged. But where there is no evidence on this record, and therefore this court can be confident of ruling in our favor, is on the relationship between the Sitko Group and Millennium. The sole piece of evidence in the record is the offering memorandum, which disclosed that Millennium was an affiliate of a Sitko entity, not the Sitko Group, but Sitko Fund Services, and that is at ROA 32141 to 32142. Now, it is true that the district court in a passing statement referred to the notion that Millennium is a wholly owned subsidiary of the Sitko Group. But there is no support in the record for that proposition. The district court made that statement very much in passing as part of a broader statement about how Millennium owned all of the voting shares and leveraged, and the district court cited a passage of plaintiff's brief that discussed only that relationship. And so that's really the sole hook on which plaintiffs hang their hat in their brief for the notion that Sitko Group had a relationship with Millennium. Now, I think it's also true that the relationship between Millennium and Leverage was not as simple as plaintiffs make out. And notably, the district court, in its opinion, refusing to grant summary judgment on the issue of that relationship, pointed out that there was undisputed evidence in the record that Millennium held the voting shares of Leverage only for administrative convenience so as to take advantage of Cayman Islands law, and, in fact, that Leverage's board of directors and, of course, Fletcher Asset Management exercised actual control over all of the payment and investment decisions. But the court doesn't need to wade into any of that. The straightest line to rule in our favor on the issue of control person liability is to say that even assuming that ability to control is sufficient, and, again, we think that the law is sufficiently clear that the court may want to just go ahead and say that actual control is required, but if you don't want to do that, you can just say that whatever the standard, the evidence in the record here is insufficient because of the gap on that relationship between the SITCO group and Millennium. And I think that the other two theories— Let me just interrupt just because you'll want the hard questions. One's factual and one's legal. Factually, it did seem like the district judge here said there was a relationship, there was knowledge, there was clearly interest to protect the loan. All of that together factually plus the ability to control moves us far, far away from just an auditor. I don't think so, which is to say that we have— First of all, I think it's important to realize that plaintiffs themselves articulate these theories as essentially three alternative theories of control person liability. I think when it comes to the SITCO group, it is really a theory of ownership. And, yes, they have their theory that there might have been a financial incentive, but I don't think that goes to the question of either actual control or an ability to control. I think on that, the theory is based on this attenuated theory of ownership through Millennium. There is also this— We aren't really worried about a circuit split because this is interpreting Louisiana law, correct? So although in HECT we said it's thin, we should look to federal law, when you actually go back to look at the control person statute, it does contemplate indirect control. Why wouldn't that mean you could have a two-step— What I'm worried about is announcing a rule of law that allows people to structure a puppeteer arrangement where you have an intermediate level. You don't need to do that to rule in our favor. And, frankly, federal law as well talks about indirect or direct control, which I think just stands for the proposition that, yes, you can exercise control through an intermediary, a third person. We certainly don't dispute that proposition. My point was simply the more modest point that even assuming arguendo that ownership is enough, and I would note parenthetically that there are plenty of cases that explain why that should not be the law because when you're a passive owner, you have the right to actually employ others to actually control the relevant party. Is the best case the First Circuit case, Aldridge? I think that that's the case that has the best reasoning as to why this standard is the correct standard. And the Louisiana cases do look to federal law, and I think that federal law in its definition of control is materially indistinguishable. But I interrupted you as I have a habit of doing. What's the limiting principle so that companies cannot structure themselves to have a two-step process, hence never control group liability? I think under an actual control standard, you look to the activities of the defendant to determine whether they actually exercise a sufficient amount of control over the primary violator, which they can do through an intermediary. And again, here there is no evidence whatsoever of that either with regard to the CITGO group or with regard to the CITGO affiliates. And I mentioned the two other theories on which plaintiffs rely. Those are the theories involving CITGO banking and CITGO fund services. Those theories really are theories of but-for causation. They really are theories that if those entities which extended a loan and which provided administrative services had acted differently, they could have, in Mr. Price's words, been in a position to prevent the violation. And we know that that is not sufficient. And I think even if you had an ability to control standard, that standard should not go so far as to be but-for causation. I'm not aware of any cases that say that that is true. I think the Solow case effectively rejects that proposition, and that's, of course, a decision of the Louisiana Court of Appeal, but I think it's a decision that this court cited with approval in the Heck case. And so I think that those theories, as to the CITGO affiliates, plainly fail even under an ability-to-control standard because, again, those are essentially but-for theories. And if the standard were but-for causation, control person liability would sweep in every auditor and secondary actor. To go back to the first theory, I want to make sure I understand your position. It's that none of the CITGO entities, in fact, have the voting shares in Millennium? There's no evidence of that whatsoever in this record. All right, so you're not saying that they don't have it. It's just that the evidentiary record is lacking. There's no evidence. I'm not aware of any such ownership relationship, but there's no such evidence. One, it's their burden at this stage. Absolutely. They've presented no evidence that CITGO has any voting shares whatsoever in Millennium. Yeah, and so I think that this court could make a Heck-like opinion if it wanted to, and that is essentially what Judge Dick did here, too, because I think it bears underscoring that Judge Dick did not say that the legal standard in the wake of Heck is actual control, and that's the only basis on which she was granting summary judgment. She certainly did point out the absence of any evidence of actual control. She seemed to want a sufficiently significant relationship, though. She repeatedly uses the word significant. Where was that from? Do you think that's just implicit in actual control? I think it's implicit in both actual control and an ability to control, which is to say, again, that even if it's an ability-to-control standard, I think that but-for causation is insufficient. I think that you have to have a closer degree of nexus or at least a greater degree of power potentially to control. Ownership of all the voting shares would be enough under that standard, right, under either standard? I'm not sure that it would necessarily be enough. In other words, if you had evidence, as we do with regard to the Millennium leverage part of this, that the ownership of the shares was only for administrative convenience, I'm not sure that that would be sufficient. But again, here, because we have the breakdown between the Citgo group and Millennium, I don't think the Court needs to wade into those issues and sort of encyclopedically categorize the contours of the standard. Now, I do think that... And that relates to a question I was going to ask. It sounds like you believe you have an evidentiary defense, no matter what the legal standard is, but I am curious just to ask, is there a world in which it would make sense to certify this question to the Louisiana Supreme Court? I don't think that there's any reason to believe that the Louisiana Supreme Court would adopt an ability-to-control standard because there's no footing for that in Louisiana law, and plaintiffs don't ask for it. But I think, and to turn in my last three and a half minutes to this, I think what makes this a poor candidate for that is that there is an alternative and I think even straighter line to affirmance, and that is the alternative ground of the running of the prescriptive period. Because, of course, Judge Dick resolved the Louisiana civil law claims on the basis of the prescriptive period, and while the prescriptive period here is a somewhat longer one, two years rather than one year, almost all of the events on which she relied as sufficient to put the plaintiffs on inquiry notice occurred outside the two-year period. Do you think we can theoretically reach that issue ourselves? We don't need to send it back. The court can absolutely reach that issue itself. Indeed, in the earlier Grant Thornton appeal in this litigation, of which Judge Weiner was on the panel, this court reached that as an alternative ground, even though the district court had dismissed those claims without prejudice and converted it into a dismissal with prejudice because the arguments concerning the limitations period were straightforward. What connected CITCO to Grant Thornton's financial statements, which were January before March, right, in 2011, which would make it prescribed? I guess what I'm asking is what event, the critical date would be March 1st of 2011. Correct. So what event prior to that gave them notice that they might have a cause of action against your client as opposed to leverage? Under Louisiana law, it is clear that that nexus to the particular defendant is not required for purposes of inquiry notice. All that is required is that the plaintiffs have a reasonable basis to know about the claim. Of course, here the claim is the claim that leveraged the primary violator engaged in a violation of the Louisiana Securities Act. The sole other question is who can be an eligible defendant. On that issue, we would point the court to, among other cases, the patent case, which says that the failure on the part of a plaintiff to ascertain whom to sue within a year does not toll the running of prescription and that the plaintiff must exercise reasonable diligence. But your argument also is to the extent they're persuasive on control person liability, stock ownership being sufficient to show ability to control, then any plaintiff would know that they're alter egos. Well, and that was the upshot of Judge Dick's reasoning in granting summary judgment on the other claims on the basis of this period. Is that analysis correct? Well, I think it could be correct if you thought that there needed to be some basis for knowing that the CITCO defendants were potential defendants. Indeed, of course, it bears emphasizing that the offering documents themselves disclose the services that CITCO was actually performing, namely that a CITCO entity was acting as the administrator, that CITCO fund services might even have a conflict of interest. I thought that offering document even disclosed that they actually were full owners of Millennium, no? No. There was a disclosure that CITCO was an investor at ROA 32122. But, of course, we don't think that there is any evidence in the offering documents or elsewhere that CITCO owned Millennium. And yet there is a district court finding of fact as to that. I would just respectfully dispute that that's a finding of fact. It is an actual statement by the district court, but a statement very much in passing as part of a broader and undisputably correct statement that Millennium owned all of the voting shares of Leveraged. And, again, the support that the district court cited was for that proposition, and the question for this court is whether there is any evidence in the record for that. And the last thing I would just say, because I see that my red light is on, is that I do think that on the prescriptive period, the relevant standard under Louisiana law is plainly an inquiry notice standard. It is somewhat different from the standard governing 1934 Act claims in federal law that was articulated by the Supreme Court in the Merck case, interpreting specific statutory language. And all that is required, again, is a reasonable basis for the claim. And the plaintiffs here make no argument that they made any effort to investigate further once they were on inquiry notice, and the types of documents on which we're relying, SEC subpoenas, restatements of financial statements, and, of course, news articles disclosing rampant misconduct at Fletcher Asset Management, are the paradigmatic types of events that constitute storm warnings for purposes of inquiry notice. And so I think if the court has any concern about the control question and the exact contours of the law, the easiest route to an affirmance is on the prescriptive period. Thank you, Counselor. Thank you very much. Mr. Price. Let me be real quick in responding, and then I'll respond to the prescription issue. NRA Music Maker case is 201-WL-340-62431. It deals exactly with the situation where you had a parent corporation controlling a subsidiary. And you've really got to think about that because what you're doing is establishing a way for an entity to avoid controlled personal liability by just putting it into a wholly owned subsidiary. That's never been the law as far back as the 34 Act was adopted. And really what the 34 Act deals with is setting up dummy entities to exercise control. If you look at the whole line of cases from Enron, your decision in Heck wasn't the first one that you deal with that control could be any action you could take to prevent. There's a whole body of law based upon Enron which was the same that you decided in the Heck case. The other thing is that it would not be in accordance with the law. We're going to have more Ponzi schemes. If you give an incentive to a company that knows what's going on and not to act, and it insulates them from liability. And that's exactly what's going on here in this case. I mean, as you notice, they don't contest. Save time for prescription. Okay. And then let me just say. What is your evidence that CITCO had all the voting shares? Because in the offering memorandum it says that Millennium is an affiliate of CITCO in the offering memorandum. And the second thing is Christopher Schmitz, the chairman of the board in his deposition, stated that CITCO controlled the company by virtue of it being qualified as not a controlled foreign corporation under 954 and 957. If you look at my rebuttal brief, you'll see.  Well, no, it's in my brief in the rebuttal section. But he says, he explains exactly why it has to be controlled by an offshore entity when I ask the question. So the suggestion that CITCO grew when all the people that acted on behalf of Millennium were the people, were the CITCO employees, whether Zuntemeyer or whether, you know, it was the gentleman that was head of the administrator, it just doesn't wash. It's all issues. And we outline it in detail, the action these people are taking. Now, let me go to the prescription issue, if you don't mind. The question is, when do we have knowledge of the claim against CITCO? It wasn't in the newspaper that they took the $50 million. It wasn't in the audit reports. It wasn't in any of those documents. It wasn't even any notice of the claim that we have against CITCO. Now, what's wrong about the way that they're arguing the prescription issue is that, as we point out in our bundle brief, leverage's net worth actually went up on the restatement. Not an adverse change. When they sent out the statement in August, they said, don't worry about it. It's a minor adjustment. So, see, these are all questions of fact that shouldn't be decided. Well, this issue wasn't even decided at the district court. You know, the district court decided the issue based on the one-year prescription and not the two. I think in the case that you were on on Grant Thornton, we pretty much concluded, yeah, that's right, that June 2011, the date they wanted to give us the promissory note was the trigger date, and that's within the two-year prescriptive period. It's not within the one, but it's within the two, but you have a two-year prescriptive period here. I think the Merck case does a great job of explaining, much better than I could do, why it's not the inquiry date but the date that you have knowledge of all of the elements of the cause of action. If you had knowledge as to leveraged, and your separate argument is that leveraged, it was publicly known that it's owned by Millennium and CITCO, why would you have all the elements of the cause of action against CITCO? Well, you knew that they own the voting shares. You didn't know that they had taken a $50 million benefit, and that's the, as we find the case today, that's where we are with it because they don't contest the $50 million benefit. That is no small thing. That's half of the money that the Louisiana funds put up that was concealed, and I'll end on the concealment. Both of these cases, Lamont and the Merck case, say, look, we've got to have a special rule for concealment or fraud. This is a concealment or fraud case where they took $50 million of our money, and both Merck and that says that. You've both made good arguments. I think your red light's on. Is that fine? You're all set? Yes. All right. Thank you very much. Thank you. And today's cases are submitted.